UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREGORY R. HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0896-DFH-TAB |
| | ) | |
| OS RESTAURANT SERVICE, INC. | ) | |
| d/b/a CHEESEBURGER IN PARADISE, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY DENYING MOTION FOR SUMMARY JUDGMENT,
DISCOVERY MOTIONS, AND DIRECTING FURTHER PROCEEDINGS

Plaintiff Gregory R. Henderson has sued his former employer, OS
Restaurant Services, Inc. ("OS"), alleging that OS subjected him to a racially
hostile work environment and/or racial discrimination and subsequently
terminated his employment on the basis of race and/or in retaliation for opposing
and complaining of conduct that he believes was racial discrimination, all in
violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. OS
seeks resolution of these claims through the entry of summary judgment. As
explained below, the defendant's motion for summary judgment is denied.

*Summary Judgment Standard*

Summary judgment should be granted "if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue
as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c), as amended; *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party, giving the non-moving party the benefit of conflicts in the evidence and all favorable, reasonable inferences from the evidence. See *id.* at 248-49; *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

A party may not create a genuine issue of material fact by contradicting prior sworn deposition testimony, at least without a plausible explanation for the change, such as a mistake, a confusing question, or a temporary lapse of memory. *E.g.*, *Cowan v. Prudential Ins. Co.*, 141 F.3d 751, 756 (7th Cir. 1998); see also *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003) ("party's failure to comply with summary judgment evidentiary requirements is traditionally remedied . . . by excluding the non-conforming submission and deeming the opposing party's proposed findings of fact admitted and then determining whether those facts entitle the moving party to judgment as a matter of law") (citing cases). The defendants assert that statements contained in Henderson's affidavit filed in opposition to summary judgment should not be considered because they contradict his prior deposition testimony.

Henderson's attempt in his affidavit to characterize his brief interaction with bar manager John Skolak as harassment must be stricken. The first time that

Henderson identified Skolak as a harasser was in the affidavit, though he was given ample opportunity to do so in his deposition.  See Henderson Dep. 215-16, 223.  (The new allegations appear to be Henderson's direct response to the fact that Skolak provided an affidavit in support of summary judgment.)  Additional discrepancies between Henderson's affidavit and deposition testimony appear to be minor, so that the affidavit permissibly supplements Henderson's prior testimony.  See *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999).

*Facts for Purposes of Summary Judgment*

On the basis of the pleadings and the expanded record, the court treats the following facts as true for purposes of the motion for summary judgment, though without evaluating the credibility of conflicting evidence.  On or about April 30, 2005, Henderson is African American and was hired by OS to work at the Cheeseburger in Paradise restaurant in Bloomington, Indiana.  He worked mostly as a prep cook, specifically in the potato-prep station at the "back of the house."  While Henderson's co-workers included individuals who were Hispanic as well as African American and Caucasian, Henderson asserts that he was the only African American employed in the "back of the house" kitchen area.  The chef who supervised the restaurant kitchen area was Darrin Greenwell, a Caucasian.

OS at all relevant times maintained employment policies for the Bloomington restaurant, including anti-harassment and anti-discrimination

policies prohibiting race-based discrimination and harassment.   Henderson acknowledged receiving copies and otherwise being aware of these policies and the complaint procedures as early as the date he was hired.

Henderson testified to one occasion (the time frame is unclear) when Greenwell used the "N-word" in reference to Greenwell's former roommate. However, the gravamen of Henderson's complaint is that on or about Thursday, September 29, 2005, Greenwell allegedly called Henderson over from the potato/french fry station and waived a string tied in a knot in front of Henderson's face.   Henderson interpreted this string and knot to be a small noose.   When Henderson told Greenwell that he could get in trouble for that, Greenwell allegedly stated "won't nobody get in trouble, that's why we pay our lawyers millions and millions of dollars."   Greenwell later put a banana in the string loop and hung it up.   Henderson took pictures of the hanging banana before the end of his shift. These pictures show a single banana hanging from a string off of a shelving unit. Another picture shows two opened boxes of bananas on a shelf.   It does not appear from the pictures that the banana was hanging from the shelf on which the boxes of bananas were placed.   Henderson completed his normal work duties working as fast as he could and then left.   He did not otherwise report the incident to anyone.   When he returned to work several days later on October 3, 2005, the banana and string were gone.

Within three days of the banana incident, Henderson called one of the phone numbers listed in his employee handbook for reporting harassment and left a voice message.  Robert Donovan of OS's corporate counsel's office returned his call.  Donovan asked Henderson to describe what had happened, which he did, describing the incident as discrimination.  Donovan asked Henderson to send him the pictures of the incident.  Henderson refused.  Donovan reported the incident to Joint Venture Partner/Regional Manager Reno Knight, who began an investigation into the banana incident.

Knight began by asking Greenwell for his version of the incident. In a written statement, Greenwell explained that he was cleaning out the dry storage room on the day in question, removing excess boxes and debris from the area, and found one box with only one bunch of bananas.  He explained that he had previously found a draw-string from a linen bag and decided to use this string, and a slip knot, to store the last bunch of bananas from that box.  He hung the bananas with the string on a hook near the pantry station.  The next day he did not notice that the bananas were not there until approximately 1:00 when he prepared for business.[1]

Monday, October 3, 2005, was Henderson's first day back at work after the banana incident.  On that day, Henderson and supervisor Greenwell argued about

---

[1]Greenwell's statement is not consistent with the pictures Henderson says he took.

Henderson's scheduled hours, which had been reduced due to business pressures at the restaurant.  Henderson accepts that business pressures required that all employees' hours be reduced, including his, and he does not attribute any improper motive to the reduction of his hours.  Nevertheless, the discussion with Greenwell became heated.  Henderson testified that in the course of this conversation Greenwell threw his jacket down onto the floor in front of Henderson and referred to Henderson as a "f***ing buffoon."  Henderson acknowledged that he stated "quit treating me like a n***** around here, man."  At one point in the exchange, Greenwell threatened to call the police, claiming that he feared for his own safety, but he only pretended to call the police.  Henderson, apparently believing Greenwell had in fact called the police, called the police himself and reported that he was being harassed at his job. The police arrived, investigated, and found no criminal violation had occurred.  Henderson left work for the day but was told that OS wanted him to come back to work the next day, which he did.

When OS management learned of this incident, they gathered statements from others, including bar manager John Skolak and Craig Toby, a third-party vendor.  They described Henderson as agitated and speaking loudly, even yelling. The record is not clear regarding whether Skolak and Toby reported their observations of Greenwell's behavior.

On October 4, 2005, Henderson spoke with Managing Partner Scott Raven, a co-owner of the Bloomington Cheeseburger in Paradise, about Greenwell's behavior. Raven told Henderson that Raven had been called "n*****" many times and that Henderson "needed to toughen up."[2] Henderson did not understand Raven to apologize for Greenwell's behavior, discipline him, or take any action to investigate Henderson's allegations of racial harassment.

Knight scheduled a meeting with Henderson for October 13, 2007, and asked him to bring the photographs of the banana incident to the meeting. Although OS terminated Henderson's employment before this meeting occurred, he did not bring the pictures with him to work on October 13, 2007, and he testified that he had no intention of showing the pictures to Knight.

On October 13th, ten days after the first incident involving the police, a second incident between Henderson and Greenwell occurred where police were again called to the restaurant. Henderson arrived at work at 8:00 a.m., as he believed he was scheduled to report, and was told that his scheduled start time had been changed to 9:00 a.m. He began his routine job responsibilities. While he was working, Greenwell told him that he was "tired of his s***" and an argument ensued. Bar manager Skolak overheard the loud voices of Henderson and Greenwell coming from the kitchen area. Administrative assistant Krista

---

[2]While not supported by evidence, the amended complaint states that Raven is not an African American.

Owens indicated to Skolak that she feared for Greenwell's physical safety.  Skolak told Henderson to leave the restaurant, but Henderson initially refused to leave. Skolak's concern was based on his observations of Henderson's behavior and statements, and the fact that Greenwell was smaller than Henderson.[3]  Owens called the police at Skolak's request, and Henderson also called the police.  When the police arrived this second time, Henderson was told to leave.  Henderson subsequently spoke with Donovan over the telephone, who then spoke with Knight and called Henderson back, confirming to Henderson that he was fired and that he should stay off the property.

Henderson's termination paperwork stated that he was terminated on October 16, 2005, for "threatening of Darrin [Greenwell], cops involved."  Raven and Knight testified that the decision to terminate Henderson was based upon his insubordination and the perception that his continued employment posed a danger to his fellow co-workers.  Raven Aff. ¶ 13; Knight Aff. ¶ 8.

During Henderson's approximately six months as an employee of OS, he never received a formal evaluation, nor did he receive a written or oral warning

---

[3]Skolak also testified that Henderson's history of workplace violence, which he had been recently made aware of, caused him concern.  For purposes of summary judgment, this concern is suspect because it is unclear from the deposition testimony cited by the defendant that Henderson was involved in an incident that should be described as "workplace violence."  In addition it is unclear what incident Skolak was referring to or how he learned of this information.  A jury could infer that Skolak had been told that Henderson had been in a past workplace violent incident in an effort to discredit Henderson.

regarding his performance or attendance from any supervisor or manager. Henderson's briefs describe his work performance as "exemplary," but in his deposition he conceded that he had some days that were not "up to par." Managing partner Raven disagreed that Henderson's work performance was "exemplary." Raven testified that he typically was present at the restaurant five to six days per week and observed that Henderson was not meeting the company's expectations. Specifically, Henderson was late to work, occasionally left before being checked out, did not comply with sanitary procedures, and was insubordinate toward his supervisors, including then-kitchen manager Greenwell and several sous chefs (also Caucasian). Other facts are noted below as needed, keeping in mind the standard for summary judgment.

*Conclusions of Law*

I.    *Race Discrimination Claims*

Henderson has brought his race-based claims under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  The analysis is essentially identical under both statutes.  *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996).

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against individuals on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  A plaintiff in a Title VII case may proceed under a direct or indirect method of proof.  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004); *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption.  *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997).  The direct evidence must show that the defendant said or did something indicating discriminatory animus with regard to the specific employment decision in question.  *Id.*  In short, "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus."  *Rogers*, 320 F.3d at 753 (internal quotation omitted).

"A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Illinois Dep't of Transportation*, 359 F.3d 498, 504 (7th Cir. 2004), quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "That circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'" *Id.*, quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Under the alternative indirect method, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). The test consists of three steps. First, the plaintiff must offer evidence of a *prima facie* case of discrimination – circumstances which, if not otherwise explained, would permit the inference of discriminatory intent. Second, once the *prima facie* case is offered, the defendant must state a legitimate, non-discriminatory reason for the adverse employment action. Finally, if a legitimate, non-discriminatory reason is offered, the plaintiff must come forward with evidence that the stated reason is not the true one but only a false pretext, thus allowing an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802-04; *DeLoach v. Infinity Broadcasting*, 164 F.3d 398, 401 (7th Cir. 1999).

A.   *Direct Evidence of Discriminatory Discharge*

Henderson has provided enough circumstantial evidence to allow a jury to infer intentional discrimination in his termination.  *Rhodes v. Illinois Dep't of Transportation*, 359 F.3d at 504, quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d at 736.  OS asserts that summary judgment is proper on Henderson's discriminatory discharge claim because there is no direct evidence of race discrimination as the true reason behind Henderson's termination.  However, Henderson offered evidence that:  (1) Greenwell and Raven both used the "N-word" to refer to someone else in the presence of Henderson; (2) Greenwell created a noose out of a piece of string, taunted Henderson with it, and then hung a single banana from the string in Henderson's view for the duration of Henderson's work day; (3) Knight was aware of Henderson's allegations of harassment by Greenwell; (4) Greenwell and Henderson got into two heated arguments that resulted in the police being called; and (5) Knight terminated Henderson in response to the arguments between Henderson and Greenwell that had involved the police.

The defendants contend that there was nothing objectively racial about the banana incident.  They even fault the plaintiff for not asking Greenwell what he actually intended by placing the banana in the string or asking Greenwell why he had done and said what he did.  They also argue that even if Greenwell harbored some racial animus against Henderson, Knight did not, so that the termination decision was not tainted by race.

In considering the banana incident, the court keeps in mind the Seventh Circuit's and Supreme Court's instructions to give careful consideration to "the social context in which particular behavior occurs and is experienced by its target," *Cerros v. Steel Technologies*, 288 F.3d 1040, 1046 (7th Cir. 2002), quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and keeps in mind that "the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships. . . ." *Id., quoting Oncale*, 523 U.S. at 82, 118 S. Ct. 998.  In *Henderson v. Irving Materials, Inc.*, this court found the defendants' contention that white employees' threat to drag an African American employee behind a pick-up truck was devoid of a racial element was "blind to history."  329 F. Supp. 2d 1002, 1009 (S.D. Ind., 2004).  Similarly, waving a noose of any size in the face of an African American person can be objectively offensive.  To argue that this action is, as a matter of law, devoid of a racial element ignores this country's bitter history of racist lynching of African Americans.  Hanging the banana, followed by Greenwell's comment, "won't nobody get in trouble, that's why we pay our lawyers millions and millions of dollars," is enough for a reasonable jury to conclude that Greenwell was motivated by racial animus in creating the noose and hanging it for Henderson to see.

A reasonable jury also could conclude that the Greenwell intimidated and provoked Henderson out of racial animus, resulting in the two heated arguments between them and ultimately in the police being called.  It is undisputed that all

of Greenwell's actions occurred in his capacity as the manager and supervisor of Henderson.  Greenwell was not the ultimate decision maker for OS; Knight made the final decision to fire Henderson.

However, Knight was aware of all of these events, including the arguments between Henderson and Greenwell requiring police intervention, which led Knight, after consultation with Donovan, to terminate Henderson's employment.  In discriminatory termination cases, an employer may be liable where a relatively low-ranking supervisor uses others in the company as his "cat's paw" – as a conduit of his prejudice.  See *Jennings v. Illinois Dep't of Corrections*, 496 F.3d 764, 768 (7th Cir. 2007), citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (holding that if review committee that was ignorant of district manager's age-based discriminatory animus acted "as the conduit of [manager's] prejudice – his cat's paw – the innocence of its members would not spare the company from liability").  Based on this evidence, a reasonable jury could conclude that Greenwell acted out of racial animus to intimidate and provoke Henderson, resulting in two arguments requiring police intervention, and that Knight's response to these incidents, while aware of their racial content, made him a conduit of Greenwell's prejudice in terminating Henderson's employment.

This is obviously not the only way to interpret the evidence.  But when the court considers a motion for summary judgment, the court may not choose between two conflicting sets of reasonable inferences from the evidence.

Henderson's evidence is sufficient to create a "mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision-maker." The defendants' motion for summary judgment must be denied on Henderson's discriminatory discharge claim under the direct method. See *Rhodes*, 359 F.3d at 504, quoting *Troupe*, 20 F.3d at 736.

      B.    *Indirect Proof of Discriminatory Discharge*

For Henderson to pursue a claim of race discrimination using the indirect method, he must set forth a *prima facie* case of race discrimination under Title VII and § 1981 by offering evidence that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). "An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 540.

First, Henderson is a member of a protected class based on his race. Second, there is a material question of disputed fact regarding whether Henderson was meeting his employer's legitimate performance expectations.

During his employment Henderson never received a written or oral warning regarding his performance or attendance from any supervisor or manager, while managing partner Raven has testified that Henderson was not meeting the company's expectations.   The question is a disputed issue of fact.   Third, Henderson suffered an adverse employment action when he was terminated. Finally, Greenwell is a similarly situated employee who is not a member of the protected class and who was treated more favorably.   Both Greenwell and Henderson were in two arguments that required police intervention, but only Henderson was terminated.   Although, Greenwell was a supervisor, he is still directly comparable to Henderson in all material respects because both were subordinates of Knight, the nominal decision maker.  The fact that Greenwell also supervised Henderson tends to weigh against the comparison.  However, the court is not persuaded that, as a matter of law, the comparison is untenable when comparing OS's response to the altercations between the two.  See *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007) (reversing summary judgment for employer and warning against too rigid or inflexible application of the "similarly situated" element).   There is no indication that OS's behavior standards are different for Henderson's and Greenwell's positions.

At the second phase of the indirect proof method, OS states that "the true reason for Henderson's termination was his insubordination, and the fear that he represented a dangerous element at the workplace."   A reasonable jury could conclude that OS's stated reason for terminating Henderson was false.  This could

be a reasonable conclusion because a jury could find that Henderson's insubordination was a direct response to a racially hostile work environment and harassment by his supervisor.  In addition, if OS was concerned about arguments in the workplace, a reasonable jury could infer that Greenwell arguably should have been terminated or at least disciplined as well.  In addition, there is no indication that anyone physically harmed or touched anyone else during the course of the arguments.  Accordingly, OS is not entitled to summary judgment on Henderson's Title VII and § 1981 claims that he was fired because of his race.

C.    *Hostile Work Environment Claim*

An employer may be liable for discrimination within the meaning of Title VII if an employee is subjected to a hostile work environment based on his race.  To survive summary judgment on a hostile work environment claim pursuant to Title VII, Henderson must establish that:  "(1) he was subjected to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability."  *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005).  Similarly, to be actionable under § 1981, "harassment must be:  (1) based on race; (2) subjectively and objectively hostile; and (3) sufficiently severe or pervasive to interfere with an employee's ability to perform his assigned duties."  *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 271 (7th Cir. 2004).  "Under the

objective hostility analysis, courts may consider:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's ability to complete his or her assigned duties."  *Id.* (internal citations and quotations omitted).  The court addresses Title VII and § 1981 claims under the same standard.  See *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1028 (7th Cir. 2004) (discussing hostile work environment claim).

In support of his hostile work environment claim, Henderson offers evidence that Greenwell used the "N-word" in reference to another person in Henderson's presence, taunted him with a banana hung by a small noose, and intimidated or goaded him into two arguments that ultimately required police intervention.[4] These events are sufficient to allow a jury to find that the harassment was severe enough to alter the conditions of his employment.  These events which occurred between September 29, 2005, and October 13, 2005, were sufficiently frequent and physically threatening to allow a jury to find that his workplace was permeated with discriminatory ridicule, intimidation, and insult, as required to establish a claim of hostile work environment.  *Dandy v. USP, Inc.*, 388 F.3d 263, 270-72 (7th Cir. 2004); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004).  Although the evidence suggests that Henderson was able to continue working and to complete his assigned duties following the banana incident, he

---

[4]This analysis is limited to the claims made against Greenwell because during Henderson's deposition he specifically identified only Greenwell as an alleged harasser.

was not able to continue working following the two arguments with Greenwell that resulted in police intervention.

Whether OS is responsible for the unwelcome acts of its employees depends on whether it reasonably responded to the discriminatory conditions.   See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. Boca Raton*, 524 U.S. 775 (1998).  An employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with authority over an employee, but when no tangible employment action is taken, a defending employer may raise an affirmative defense with two elements:  "(a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Haugerud v. Amery School Dist.*, 259 F.3d 678, 697 (7th Cir. 2001).  "[A]n employer can be liable . . . where its own negligence is a cause of the harassment. An employer is negligent with respect to [racial] harassment if it knew or should have known about the conduct and failed to stop it.   Negligence sets a minimum standard for employer liability under Title VII." *Bright v. Hill's Pet Nutrition, Inc.*, — F.3d —, —, 2007 WL 4461787, at *3 (7th Cir. Dec. 21, 2007), quoting *Faragher*, 524 U.S. at 759.

OS had anti-harassment and anti-discrimination policies prohibiting race-based discrimination and harassment.  Henderson was aware of these policies and

properly followed instructions in reporting the banana incident to OS. In addition, Henderson was objectively aware of Raven's knowledge that an altercation had occurred between Greenwell and Henderson resulting in the police being called. OS claims that it promptly investigated Henderson's claim of harassment, and that Henderson failed to take advantage of this investigation by refusing to show pictures documenting the banana incident to the persons investigating his claim. Given the record, there is a material fact in dispute regarding whether OS exercised reasonable care to prevent and correct Greenwell's harassing behavior and whether Henderson unreasonably failed to take advantage of any preventive or corrective opportunities offered by OS. Henderson was asked for the pictures, and Greenwell was asked to write a statement of what occurred regarding the banana incident. Beyond this one request and statement being made, no other efforts were made to investigate before Henderson's termination on October 13, 2005. When the facts are considered in the light most favorable to Henderson, a reasonable jury could conclude that OS was negligent in its investigation of Greenwell's harassment of Henderson and that this negligence allowed the harassment to continue, escalating in the two altercations requiring police intervention. OS is not entitled to summary judgment on Henderson's hostile environment claim.

II.    *Retaliation Claim*

Henderson also contends he was fired because he complained about what he believed was racial harassment by Greenwell.  To survive summary judgment on a retaliation claim under the direct method, a plaintiff must show (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Kodl v. Board of Educ. School Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007).  "Under the indirect method, plaintiff must show that he (1) engaged in statutorily protected expression, (2) met the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected expression."  *Kodl*, 490 F.3d at 562, citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  "Absent direct evidence of retaliation, failure to satisfy any element of the *prima facie* case proves fatal to the employee's retaliation claim."  *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465 (7th Cir.).  The same *prima facie* requirements apply to a § 1981 retaliation claim as apply to Title VII retaliation claim.  *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-404 (7th Cir. 2007).

Henderson's termination constituted an adverse employment action. Henderson also engaged in protected activity by reporting what he believed to be racially motivated statements and actions directed at him by his supervisor to OS's corporate office pursuant to the company's anti-discrimination policy sometime between September 29 and October 3, 2005.  Henderson also claims

that he opposed OS's unlawful employment practices and engaged in protected activity by calling the Bloomington Police Department on October 3 and October 13, 2005.  *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001) (holding that filing a police report was protected activity).   To show protected activity, Henderson is not required to prove that Greenwell's conduct actually violated Title VII or § 1981.  It is sufficient if he had a reasonable and good faith belief that Greenwell's conduct violated the law.  *E.g.*, *Hamner v. St. Vincent Hospital and Health Care Center, Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000).

Henderson pursues this claim under the direct method.  He asserts that there is a causal connection between his reporting Greenwell's behavior with the noose and banana, his calls to the police, and his subsequent termination. Donovan, Raven and Knight were aware that Henderson had participated in protected expression by reporting the banana incident to OS's counsel and by calling the police on October 3, 2005.  Within two weeks of this complaint, Henderson was terminated.  On October 13, 2005, Greenwell allegedly initiated an argument with Henderson by not telling him that his schedule was changed and stating that he was tired of Henderson's "s***."  Again Henderson (along with administrative assistant Owens) called the police.  OS contends that it terminated Henderson the next day because of his insubordination and threatening behavior towards Greenwell.  However, when the facts are considered in the light most favorable to Henderson, a reasonable jury could conclude that Henderson was terminated not because of his insubordination and threatening behavior, but

because he complained about and resisted Greenwell's actions by complaining to OS management and calling the police.  This interpretation is supported by Henderson's termination paperwork, which states that he was terminated on October 16, 2005 for "threatening of Darrin [Greenwell], cops involved."  It is possible that a jury could conclude that Greenwell was the aggressor, that Henderson's co-workers perceived him as dangerous based only on rumors that he was previously involved in workplace violence, and that he was terminated for reporting Greenwell's behavior to both OS and the police.  Accordingly, the defendant is not entitled to summary judgment on Henderson's retaliation claim.[5]

III.   *Pending Discovery Motions*

On July 25, 2007, Henderson submitted a motion to compel that is substantially similar to two previously filed motions to compel, which this court determined were improperly labeled as motions to compel as they were routine discovery requests.  See Docket Nos. 64-66.  OS represents that it previously responded to Henderson's prior requests and that his latest request is both

---

[5]To the extent that Henderson asserts that OS's retaliation took the form of leaving him off the schedule the week of August 25-31, 2005 and being placed at the end of the kitchen away from co-workers to work on potatoes, these allegations of retaliation do not further Henderson's claim.  First, Henderson's allegation that he was left off of the schedule occurred before he made a complaint, and thus OS was incapable of retaliating by leaving him off the schedule.  *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (explaining that an employer cannot retaliate when it is unaware of any complaints).  Second, it appears from the record that Henderson was placed at the potato station prior to September 29, 2005, and thus his placement at that post also could not have been in retaliation for a complaint he had not yet made.

repetitive and untimely.[6]  The court's May 14, 2007, Entry made clear that all discovery requests were to be served on or before May 22, 2007, and responded to by the close of discovery on May 30, 2007.  Given Henderson's untimely request and OS's prior responses, the latest motion to compel (Dkt. No. 70) is denied.

On July 17, 2007, Henderson filed Motion to Oppose Affidavits of John Skolak (Dkt. No. 71), Motion to Oppose Affidavit of Reno Knight (Dkt. No. 72), and Motion to Oppose Affidavit of Scott Raven (Dkt. No. 73) pursuant to Federal Rule of Civil Procedure 56(g) alleging that these affidavits were filed in bad faith. As amended in 2007, Rule 56(g) states:

> If satisfied that an affidavit under this rule is submitted in bad faith or solely for delay, the court must order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result.  An offending party or attorney may also be held in contempt.

There is no evidence that the affidavits submitted by Skolak, Knight, or Raven were made in bad faith or that the affiants committed perjury regarding a material fact.  See *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 731 (7th Cir. 2001) (stating in dicta that Rule 56(g) motion lacked merit because the alleged perjury was not

---

[6]This motion appears to be duplicative of a prior motion with "John Skolak" replacing "Plaintiff" in two places, thus requesting production of John Skolak's performance evaluations and disciplinary warnings or reprimands.  Even if Henderson had made this discovery request within the discovery deadline, it is unclear that it would be relevant to his discrimination claims because Henderson does not allege that Skolak discriminated against him in his complaint and Skolak is a manager in a different area of the restaurant and thus not a similarly situated employee.

material).   The affidavits here appear to conform to Rule 56(e).   If Henderson wanted to oppose Skolak's, Knight's or Raven's affidavits, the proper means of doing so was by deposition, interrogatories, or further affidavits with conflicting evidence.   Filing motions to "oppose" the affidavits because they do not contain all of the information that the plaintiff would like is a waste of time.   Plaintiff had ample opportunity during the course of discovery to solicit answers to the questions he poses in his motions in opposition to the affidavits.   OS presented affiant Scott Raven at Henderson's deposition to be deposed by Henderson, but Henderson chose not to depose Raven at that time.   In addition, Henderson asked for and received an extension in the discovery deadline from April 30, 2007 to May 30, 2007 for the purpose of conducting discovery regarding Skolak (see Dkt. No. 48), but Henderson appears to have never sought a deposition of Skolak. Therefore, Henderson's motions to oppose the affidavits of Skolak, Knight, and Raven (Dkt. Nos. 71-73) are denied.

On August 8, 2007, Henderson filed a Motion for Subpoena of John Skolak. As noted, the discovery period ended on May 30, 2007, and thus this motion (Dkt. No. 79) is denied as untimely.

IV.   *Directing Further Proceedings*

Henderson shall have 28 days from the date this Entry is issued to notify the court as to whether he seeks the court's assistance in attempting to recruit counsel to assist in the prosecution of his retaliatory discharge claim.

In the event that Henderson requests the court's assistance in recruiting counsel, the court will consider reopening discovery to allow the plaintiff's counsel to prepare better for trial.

For the foregoing reasons, OS's motion for summary judgment is denied, as are the discovery motions (Dkt. Nos. 70, 71, 72, 73, and 79).  The plaintiff's motion to strike the defendant's reply brief is also denied.

So ordered.

Date: January 24, 2008

_David F. Hamilton_
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

R. Rogge Dunn
CLOUSE DUNN KHOSHBIN, LLP
rdunn@trialtested.com

Alejandro Valle
GONZALEZ SAGGIO & HARLAN LLP
alejandro_valle@gshllp.com

Worthy W. Walker
CLOUSE DUNN KHOSHBIN LLP
worthy@cdklawyers.com

Gregory R. Henderson
2814 Limestone Street
Bloomington, IN 47403